# EXHIBIT 4

Page 1

1                    UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
2                         ORLANDO DIVISION
3
4                    CASE NO. 6:13-cv-418-GKS-GJK
5
6  DANIELLE TACORONTE,
7                  Plaintiff,
8  vs
9  MARC B. COHEN, individually,
   GREENSPOON MARDER, P.A.,
10
11                 Defendants.
12  _____/
13
14                       DEPOSITION OF
                      DANIELLE TACORONTE
15
              Taken on behalf of the Defendants
16
17  DATE TAKEN:   December 3, 2013
18  TIME:         1:05 p.m. - 4:55 p.m.
19  PLACE:   201 East Pine Street, Suite 500
                   Orlando, Florida 32801
20
              Examination of the witness taken before:
21
                    Elizabeth J. Beyer, FPR
22
23
24
25

Page 2

1    Appearances:

2

3              J. MARSHALL GILMORE, ESQUIRE
               1936 Lee Road, Suite 100
4              Winter Park, Florida 32789
               (407) 629-7322
5              mgilmore@mgilmorelaw.com
                    Counsel for the Plaintiff
6

7

8              MEREDITH H. LEONARD, ESQUIRE
               MARC B. COHEN, ESQUIRE
9              Greenspoon Marder, P.A.
               200 East Broward Boulevard, Suite 1500
10             Fort Lauderdale, Florida 33301
               (954) 491-1120
11             meredith.leonard@gmlaw.com
                    Counsel for the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1    A    I believe it was 129,000.

2    Q    Okay.  If you flip very quickly to Exhibit A to the

3  complaint, which is Exhibit 7, you'll see --

4    A    A hundred thirty-three.

5    Q    Well, if you look Wells Fargo attached as Exhibit A

6  the equity line agreement.  It's about the fourth page in.

7  Do you see where it says credit line limit?  I think you're

8  a little bit ahead.  I think it's the fourth page, the first

9  page of the equity line agreement.

10        MR. GILMORE:  I'm lost, too.  What page are we on?

11        MS. LEONARD:  She's on the right page now.

12   A    Equity line account agreement?

13 BY MS. LEONARD:

14   Q    Yes.  Do you see what your credit line limit is?

15   A    Yes, 130.

16   Q    If you drew upon this line of credit under your

17 agreement you were required to pay it back; correct?

18   A    Yes.

19   Q    What did you purchase with what you drew upon your

20 line of credit?

21   A    I don't recall exactly.

22   Q    Did you spend all $130,000 of it?

23   A    Yes, probably.

24   Q    But you don't know what you used --

25   A    It was probably used for things for the house like

Page 56

1    as far as -- not like furniture, but, you know, like

2    cabinets, you know, sinks, doing some of the stuff in the

3    house.

4        Q    Okay.  So home furnishings, that sort of stuff?

5        A    House re -- not furnishings, no.  I don't know

6    technically what you want to call it.  Remodeling, house

7    remodeling, I guess you would say.

8        Q    Okay.  Did you do a remodeling job on your home?

9        A    Some, yes.

10       Q    How much did you owe Wells Fargo when they sued

11   you?

12       A    I thought it was 129, but I see here -- I thought

13   it was 129.

14       Q    Okay.  We can come back to that.  When did you stop

15   making payments to Wells Fargo under this agreement?

16       A    I don't remember the date.

17       Q    But you thought you owed about $129,000 when you

18   stopped making the payments?

19       A    Yes.

20       Q    When you stopped making the payments you knew you

21   were in breach of your agreement; is that right?

22       A    Yes.

23       Q    You don't deny that you borrowed the money from

24   Wells Fargo; do you?

25       A    No.

1      A     That was the one with Mr. Marc Cohen.

2   BY MS. LEONARD:

3      Q     Let me just double-check.  Okay.  That mediation

4   occurred on January 30, 2012; is that correct?

5      A     I don't know the date for sure, but if you say

6   that's the date and it's on the record, then yes.

7      Q     Okay.  It is in Composite Exhibit 8.

8      A     Okay.

9      Q     You attended that mediation; correct?

10     A     Yes.

11     Q     Who accompanied you to that mediation?

12     A     Mr. Tanner Andrews and Jesse Tacoronte, my husband.

13     Q     Jesse?

14     A     Jesus.

15     Q     Is that his nickname?

16     A     Yeah.  I call him Jesse.  Everybody calls him

17  Jesse.

18     Q     Okay.  Mr. Cohen attended this mediation as well;

19  correct?

20     A     Yes.

21     Q     He attended the mediation on behalf of Wells Fargo;

22  is that right?

23     A     He said he was on behalf of Wells Fargo, yes.

24     Q     Okay.  Did you object to Marc Cohen's participation

25  in the mediation on January 30th?

1  to follow the law, he should have to follow the law.

2      Q    Okay.  You understood that he was there on behalf

3  of Wells Fargo, whether he filed the formal notice or not?

4      A    I understand he said he was there.

5      Q    Okay.  Okay.  I'm just going to pull another

6  exhibit.

7          MS. LEONARD:  I'm going to mark this as Exhibit 9.

8          (The Equifax Credit Report Excerpt was marked

9  Exhibit 9.)

10 BY MS. LEONARD:

11     Q    This is your credit report which your attorney

12 provided to us.

13         MR. GILMORE:  It's an extract of a couple

14    pages.

15         MS. LEONARD:  Yes.

16 BY MS. LEONARD:

17     Q    Well, you could probably tell me.  You recognize

18 this document?

19     A    Yes.

20     Q    Okay.  When did you pull this report?

21     A    I don't know exactly when the report was pulled.

22 It should have a date on here.

23     Q    It looks like at the top there's an October

24 24th --

25     A    10/24/2012.

Page 88

1  occurred in January of 2012 and some hearings that occurred

2  shortly thereafter.  So this was, you know, several months

3  later.

4       A    Okay.  Uh-huh.

5       Q    You know, you had heard of Marc Cohen at that time

6  and --

7       A    Yes.  That's the thing that, you know, because we

8  seen the Cohen, Conway, Copeland.  Then we found out that

9  Cohen was Cohen, and that he used to work for that firm.

10      Q    How did you find that out?

11      A    I'm not exactly sure.  I believe my husband went

12 to some site and found out, you know, where his current

13 history, Mr. Cohen's current history was, as far as where he

14 worked.

15      Q    Okay.  When you saw this name it dawned on you that

16 it was likely Marc Cohen because of the last name, and

17 that's why you decided to --

18      A    Yeah, because we knew it wasn't Lisa Cohen.  We

19 also looked at that also, because I thought maybe it was his

20 daughter at first.

21           MR. GILMORE:  You mean Jodi Cohen?

22      A    Jodi.  I'm like, is that her dad?

23           MR. COHEN:  That we might talk about later.

24      A    And Jesse's like, maybe, I don't know.  Then, no, I

25 don't think.

Page 100

1    Q    Okay.  But you're not aware of any facts as to when

2    the defendants made a false representation with respect to

3    this $9,000?

4    A    No.

5    Q    Okay.  According to the affidavit we were just

6    looking at that showed that the interest that you had owed

7    over and above the $130,000, showing a total in debt of

8    $139,000; Mr. Cohen in fact reduced the amount you owed down

9    to $129,000; isn't that correct?

10    A    I believe so, yes.

11    Q    Okay.  What facts do you have to support your

12    allegation that Marc Cohen was trying to hide the Greenspoon

13    Marder name from you?

14    A    Can you rephrase that?

15    Q    Sure.  What facts do you have that support your

16    allegation that Mr. Cohen was trying to hide Greenspoon

17    Marder's name from you?

18    A    Well, in itself it says a request for your credit

19    history is called an inquiry.  The people that you -- you

20    know, whether he was trying to hide it or not I guess is

21    really not the issue.  The fact is that he did it, and not

22    even under the company that he was working for currently but

23    a defunct company.  Why would he do that?  Why not use

24    Greenspoon Marder?

25         Again, I wouldn't have given -- did not give

1    Q    Okay.  You've also alleged that Greenspoon Marder

2  and Jodi Cohen conspired with Marc Cohen to use this name to

3  unlawfully obtain your credit report.

4        Tell me every fact you have to support a conspiracy

5  existed between those three parties.

6    A    Can you please rephrase that or repeat that?

7    Q    Sure.  You've alleged in the amended complaint

8  filed in this lawsuit that Greenspoon Marder and Jodi Cohen

9  conspired with Marc Cohen to use this name to unlawfully

10  obtain your credit report.

11        What facts do you have to support that?

12    A    None that I know of.

13    Q    Okay.  You've also stated in your written discovery

14  responses that Marc Cohen would have an obvious advantage by

15  knowing your personal information.  What advantage would he

16  have?

17    A    By knowing like -- I don't know.  I guess just

18  knowing personal information that he wasn't entitled to.

19    Q    But how would that give him an advantage?

20    A    I don't know.  I can't say.

21    Q    Then why did he pull your credit report?

22    A    So that he -- I don't know.  I don't know why he

23  pulled my credit report.  He shouldn't have.  He didn't have

24  my permission to.

25    Q    So he didn't pull it to obtain an advantage over

1    you; is that right?

2        A    I mean, he possibly could have.  There could be

3    some possible advantage to it.  I can't think of it right

4    now.

5        Q    You don't know what it is?

6        A    No.  But irregardless I still did not apply for any

7    credit or loan with Greenspoon and Marder, CCC and P, so I

8    don't know why my credit report was even pulled to begin

9    with by them.

10        Q    Okay.  Do you have any reason to believe that Marc

11    Cohen has control over how Equifax lists certain things on

12    their own reports?

13        A    Yeah.

14        Q    What facts do you have to support that?

15        A    That he has control over it?  He could have called

16    them and told them he doesn't work with Conway, Copeland,

17    Cohen and Paiva.  He could have corrected the

18    misinformation.

19            I can't imagine this is the first time that he's

20    seen that or that your company or Greenspoon and Marder has

21    seen that.

22        Q    Well, you acknowledge this is a form from Equifax;

23    correct?

24        A    Yes.

25        Q    Okay.  So you think that Mr. Cohen has control

1    credit with Wells Fargo this equity line agreement?

2       A    I don't recall.  I can't recall.

3       Q    So you don't know why Wells Fargo would have pulled

4    your credit on January 27, 2012?

5       A    No.  I can't recall right now, or I don't know why.

6       Q    Weren't they trying to collect a debt that you owed

7    to them?

8       A    Well, they could have done it for that purpose.  I

9    don't know.  I would be trying to be a mind-reader.

10      Q    You didn't apply for a loan from Wells Fargo on

11   January 27, 2012; did you?

12     A    Not that I recall, but I did apply originally for a

13   loan or credit with them.

14     Q    The equity line agreement?

15     A    Uh-huh.  Uh-huh.

16        MR. COHEN:  Is that yes?

17     Q    Yes.  I'm sorry.  I'm sorry.

18        MR. COHEN:  That's okay.  Everybody does it.

19        MS. LEONARD:  It's been a long day.  I do it,

20   too.

21        MR. GILMORE:  I don't.

22        THE DEPONENT:  You're so perfect.

23   BY MS. LEONARD:

24     Q    Okay.  When Marc Cohen pulled your credit on

25   January 26, 2012, was he trying to collect a debt that you

1   owed to Wells Fargo?

2       A    I would assume that that's what the purpose was

3   for, yes.

4       Q    Is it your testimony that a creditor needs your

5   consent in order to pull your credit report for the purposes

6   of collecting a debt?

7       A    Can you repeat that?

8       Q    Sure.  Is it your testimony that a creditor needs

9   your consent to pull your credit report in order to collect

10  a debt that you owe?

11      A    It's my testimony that if I've applied to a

12  creditor for a loan, or an entity for a loan or credit, that

13  they have the right to pull my credit report.

14      Q    But they don't have the right to pull your --

15      A    I don't know how many times.  I don't know what the

16  law is, as far as like if you've applied to the person how

17  many times they can pull it.  I would assume they can pull

18  it one or two times, maybe, but I don't know.

19      Q    Were you aware that Marc Cohen tried to resolve the

20  Wells Fargo lawsuit with Tanner Andrews after the final

21  order of summary judgment was granted?

22      A    I don't recall that, no.

23      Q    Were you aware that he had made an offer for you to

24  pay $100 a month, to avoid having that judgment entered

25  against you, the final summary judgment for $129,000?

112

1
2
3      STATE OF FLORIDA )
                         ) SS
4      COUNTY OF BREVARD)

5
           I, the undersigned authority, do hereby certify that
6
       DANIELLE TACORONTE personally appeared before me on December
7
       3, 2013, and was duly sworn.
8
           WITNESS my hand and official seal this 6th day of
9
       December, 2013.
10
11
12
13
14
       Notary Public State of Florida
       Elizabeth J Beyer
15     My Commission EE 849546
       Expires 01/26/2017
16                                     ELIZABETH J. BEYER
                                       Notary Public, State of Florida
17
18
19
20
21
22
23
24
25

113

<u>CERTIFICATE OF REPORTER</u>

STATE OF FLORIDA )
                 )SS
COUNTY OF BREVARD)

        I, ELIZABETH J. BEYER, certify that I was authorized

to and did stenographically report the deposition of

DANIELLE TACORONTE; that a review of the transcript was

requested; and that the transcript is a true and complete

record of my stenographic notes.


        I FURTHER CERTIFY THAT I am not a relative, employee,

attorney, or counsel of any of the parties, nor am I a

relative or employee of parties' attorney or counsel

connected with the action, nor am I financially interested

in the event of this cause.


        DATED THIS 6th day of December 2013.


                    _____
                    ELIZABETH J. BEYER, FPR

The foregoing certification of this transcript does not

apply to any reproduction of the same by any means unless

under the direct control and/or direction of the certifying

reporter.